FILED IN OPEN COURT
U.S.D.C. - Atlanta

DEC 1 1 2023

Kevin R. Weimer, Clerk
By
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal Information |
| *v.* | |
| RACHEL SHEATS | No. 1:23-cr-380 |

THE UNITED STATES ATTORNEY CHARGES THAT:

### Count One – 18 U.S.C. § 371
**(Conspiracy to Pay Health Care Kickbacks)**

1.  Beginning no later than in or about August 2017, and continuing at least
until in or about December 2018, the exact dates unknown, in the Northern
District of Georgia and elsewhere, the defendant, **RACHEL SHEATS**, Glenn
Pair, Markuetric Stringfellow, Bree'Anna Harris, Dr. Duriel Gray, Individual-1,
Individual-2, Laboratory-1, and others known and unknown, did knowingly and
willfully combine, conspire, confederate, agree, and have a tacit understanding
with each other to violate Title 42, United States Code, Section 1320a-7b(b)(2)(B),
by knowingly and willfully offering and paying any remuneration, specifically,
kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in
kind, including by check, to any person to induce such person to purchase, lease,
order, and arrange for and recommend purchasing, leasing, and ordering any

good, facility, service, and item for which payment may be made in whole and in part under a Federal health care program, namely, Medicaid.

**Background**

At all times relevant to this Information:

2.  Glenn Pair, Bree'Anna Harris, and other certain co-conspirators operated a program known as "Do It for the Hood" ("D4H") in the Northern District of Georgia and elsewhere.

3.  Pair, Harris, and others pitched D4H to Atlanta-area schools as a "drug-free mentoring program" for high school and middle school students. Part of D4H's program involved holding in-school rallies — known as "Cafeteria Take-Overs" — during which Pair and others, including local rappers, gave speeches and presentations to students enrolled in the program. Students who wished to participate in the D4H program had to submit enrollment paperwork, which included their name, date of birth, and other individually identifying information. Students provided "consent" to undergo drug testing regardless of whether the student had any issues involving drugs or substance abuse.

4.  Individual-1 owned and operated National Lighthouse Foundation ("NLF"), a Georgia-based non-profit through which the D4H program was pitched to high schools. Individual-1 also sometimes participated in the D4H in-school rallies.

5.  BPolloni Consulting LLC ("BPolloni Consulting") was a North Carolina limited liability company that purportedly provided marketing and consulting services.

2

6.   Harris was the registered agent and Chief Executive Officer of BPolloni Consulting LLC.

7.   Laboratory-1 was a registered Georgia limited liability company based in Atlanta, Georgia. It provided independent laboratory testing, including toxicology and drug testing, to the public.

8.   Individual-2 was the Chief Executive Officer and owner of Laboratory-1.

9.   Defendant **RACHEL SHEATS** was employed by Laboratory-1 as its Chief Operations Officer.

10. Dr. Duriel Gray was licensed to practice medicine in the State of Georgia. Dr. Gray resided in the Northern District of Georgia and treated patients in urgent care and assisted living facility settings.

### The Georgia Medicaid Program

11. Medicaid is a health insurance program that provides for the provision of medical care to eligible low-income families. Medicaid was established to provide an array of health care services and benefits to those who, due to economic circumstances, could not otherwise afford such health care services and benefits. Medicaid is jointly funded by State governments and the United States Department of Health and Human Services, acting through the Centers for Medicare and Medicaid Services. Medicaid is a public plan or contract, affecting interstate commerce, under which medical benefits, items, and services are provided to individuals. Medicaid is a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

12. In the State of Georgia, the Georgia Department of Community Health ("DCH") administers Medicaid. Individuals who receive benefits under Medicaid are referred to as "members" or "beneficiaries."

13. In Georgia, the delivery of Medicaid health benefits to some beneficiaries is arranged through a program called Georgia Families, which is a partnership between DCH and multiple private care management organizations ("CMOs"), including CareSource, Peach State Health Plan, Amerigroup, and WellCare. Funds used to pay for services rendered by the CMOs comes, at least in part, from federal funds provided through the State's Medicaid program.

14. Georgia Medicaid also provides for the coverage of services on what is known as a fee for service ("FFS") basis. Under this portion of the program, enrolled Medicaid providers bill the program directly for covered services provided to eligible beneficiaries and receive reimbursement for such covered services through DCH's fiscal intermediary. To be eligible for reimbursement, such services must be medically necessary and comply with Medicaid's policies and procedures, as explained below.

15. DCH sets forth the terms that govern participation in and reimbursement from the Georgia Medicaid program. DCH does this by promulgating its Policies and Procedures for Medicaid/PeachCare for Kids Provider Manuals, which are published on a quarterly basis and made available to providers through its Medicaid Management Information System.

16. In order to submit bills to Medicaid for reimbursement for health care services provided to Medicaid members, an individual or entity must be an

4

approved Medicaid provider. A provider obtains this approval by applying to Medicaid and enrolling in certain Medicaid programs or services. If the application meets certain minimum qualifications, Medicaid will approve the application, and the provider receives a unique identification number called a "provider number." In addition, providers must also obtain a federal identification number, known as a National Provider Identifier or "NPI."

17. After receiving a provider number, the provider may then submit bills, known as "claims," to Medicaid to obtain reimbursement for services provided to Medicaid members. When a claim for reimbursement was submitted to Medicaid, the provider certified that the contents of the claim were true, correct, and complete, and that the claim was submitted in compliance with the laws and regulations governing the Medicaid program, including that the claim is for medically necessary services that were actually performed.

18. Georgia Medicaid defines the term "medically necessary" to include the requirement that the service is provided within generally accepted medical practices and is appropriate and consistent with the diagnosis of the treating physician and the omission of which could adversely affect the eligible member's medical condition.

19. Georgia Medicaid prohibits offering to pay or payment of remuneration, whether direct, indirect, overt, covert, in cash, or in kind, in return for the referral of a Medicaid or PeachCare for Kids member.

20. Because Georgia Medicaid is a "Federal health care program," as defined by statute, federal law makes it illegal to knowingly pay or receive remuneration,

including a kickback, bribe, or rebate, to refer an individual to a person (or business) for the furnishing or arranging for the furnishing of any item or service, including laboratory services, for which payment may be made in whole or in part under a Federal health care program.

21. Laboratory service providers must also comply with various rules and regulations promulgated by DCH, including the requirement that laboratories bill Georgia Medicaid only for services requested by an attending or consulting physician, or another medical practitioner operating in a similar capacity and who is separately enrolled in the program.

### Manner and Means

22. Beginning on a date unknown, but no later than in or about July 2017 and continuing until at least in or about December 2018, defendant **RACHEL SHEATS**, Pair, Harris, Individual-2, and their other co-conspirators devised a scheme to defraud Georgia Medicaid by sending urine samples obtained from students participating in D4H's mentoring program to Laboratory-1 for drug testing in exchange for kickbacks paid from claims submitted to Georgia Medicaid, knowing that these were medically unnecessary drug tests.

23. Pair and his co-conspirators enrolled schools into D4H's program through NLF. Frequently, Individual-1 introduced D4H into the schools through NLF. Individual-1 received several thousands of dollars to facilitate the introductions and insisted upon continued payments so long as the kickback agreement existed between D4H, BPolloni Consulting, and Laboratory-1.

24. Pair and his co-conspirators, including Harris, by and through BPolloni Consulting, paid local college students to staff DH4's programs. Harris and the college kids were responsible for signing up students at schools—focusing in particular on those who were Medicaid eligible—and going to the students' homes to ensure the students and their parents completed the necessary paperwork. The students also routinely assisted Harris by collecting the urine samples from the students at the schools, as well as at their homes on occasion.

25. Pair and his co-conspirators recruited Dr. Gray to be affiliated with D4H as its "Medical Director" and paid Dr. Gray a monthly retainer of $3,000 to serve in that role. The purpose of recruiting and paying Dr. Gray was for him to provide a "standing order" under which Laboratory-1 could submit urine samples for drug testing to Georgia Medicaid and list Dr. Gray as the "ordering" physician. The "standing order" was maintained on file by Laboratory-1 which purported to certify the medical necessity of every urine specimen received through D4H for drug testing.

26. Dr. Gray did not have a physician-patient relationship with the students and was not their attending, treating, or consulting physician as required by Georgia Medicaid Policies & Procedures. Dr. Gray never examined any of the students participating in D4H's programs. Nor did Dr. Gray ever conclude that drug testing was medically necessary for any of these students. Dr. Gray never reviewed the results of any drug screens performed and never discussed the findings of any drug screens with the individual students. Between in or about September 2017 and in or about November 2018, Dr. Gray received at least

$30,000 from Pair and his co-conspirators without performing any legitimate medical services.

27. Pair and his co-conspirators entered into an arrangement with Laboratory-1 to perform the drug testing on urine specimens submitted in the names of students participating in D4H's programs. Specifically, Pair and certain co-conspirators entered into a purported "marketing agreement" between Laboratory-1 and BPolloni Consulting to facilitate kickback payments from Laboratory-1 to Pair and his co-conspirators for the drug testing referrals for all of the samples obtained through the D4H program. BPolloni Consulting did not provide any marketing or consulting services for Laboratory-1. Individual-2 signed the purported "marketing agreement" on behalf of Laboratory-1 knowing that the agreement called for the payment of remuneration in exchange for urine specimen referrals. Defendant **RACHEL SHEATS** was a key point person at Laboratory-1 for D4H.

28. Pair and his co-conspirators negotiated with Laboratory-1 and Individual-2 how they would be compensated for providing the urine samples for the medically unnecessary testing. Defendant **RACHEL SHEATS** was responsible for ensuring payments were made, and routed all payments through BPolloni Consulting under the guise that it was for services performed under the terms of the "marketing agreement." In reality, the payments represented a percentage of the reimbursements received from Georgia Medicaid for the samples obtained through the D4H program.

29. Pair and his co-conspirators would submit and cause others to submit the urine specimens to Laboratory-1 for medically unnecessary drug testing. Laboratory-1 in turn submitted claims to Georgia Medicaid for the medically unnecessary drug testing. Defendant **RACHEL SHEATS**, Individual-2, and Laboratory-1 knew that the samples received from Pair and his co-conspirators came from the various Atlanta-area schools and also knew that the "orders" related to Dr. Gray.

30. In order to further conceal the illegal nature of their arrangement, Laboratory-1 issued 1099s for tax years 2017 and 2018 to BPolloni Consulting showing that Laboratory-1 paid BPolloni Consulting more than $250,000.

31. As a result of the above-described conspiracy and scheme to defraud, Pair, Laboratory-1, and other co-conspirators defrauded and attempted to defraud Georgia Medicaid of more than $1 million and actually caused Georgia Medicaid to pay out at least $400,000 in fraudulently submitted drug testing claims.

### Overt Acts

32. In order to carry out the conspiracy and to accomplish the objects thereof, the defendant, **RACHEL SHEATS**, and known and unknown members of the conspiracy committed various overt acts in the Northern District of Georgia, including, but not limited to, the following:

   a. In or about early 2017, the exact date being unknown, Pair met with Individual-2 to demonstrate how the D4H program worked and how the program would result in the submission of urine specimens to Laboratory-1.

b. In or about the summer of 2017, Pair, Stringfellow, and others met with Dr. Gray on multiple occasions, including at a restaurant in Marietta, Georgia to explain the D4H program and recruit Dr. Gray to serve as its "medical director."

c. On or about August 15, 2017, NLF and Dr. Gray entered into a memorandum of understanding under which Dr. Gray was purportedly responsible for, among other things, working with at-risk youth, providing clinical oversight, and signing-off on standing orders. Under this memorandum of understanding, Dr. Gray received $3,000 per month. Pair was identified as a representative of NLF in the memorandum of understanding.

d. On or about August 15, 2017, Dr. Gray completed Laboratory-1's "New Account & Preferred Order Forms." The form included a "standing order" in which Dr. Gray falsely represented that urine drug screening was medically necessary for his patients. The "standing order," however, is undated, and did not relieve Dr. Gray of his duty to actually order all tests.

e. On or about August 29, 2017, Individual-2 sent Pair an email, copying defendant **RACHEL SHEATS,** monitoring the early volume of samples received from D4H and requesting projections about anticipated future volume.

f. On or about October 20, 2017, Individual-2 sent Pair an email tracking payments received from Georgia Medicaid and setting an

expectation of the minimum volume of referrals Pair needed to produce to make the program profitable for Laboratory-1.

g. On or about December 1, 2017, Laboratory-1 and BPolloni Consulting entered into a purported "marketing and sales agreement" in an effort to disguise the basis of the illegal kickback payments between the parties.

h. On or about December 6, 2017, HARRIS executed a direct deposit authorization form with Laboratory-1 on behalf of BPolloni Consulting, which directed to what bank account the kickback payments should be made.

i. On or about May 11, 2018, defendant **RACHEL SHEATS** emailed Pair a payment spreadsheet that **SHEATS** created, which reflected payments from Laboratory-1 to D4H in connection with the medically unnecessary drug testing conducted at the schools. The spreadsheet created by **SHEATS** expressly reflects that D4H received a percentage of Medicaid reimbursements, in violation of federal law.

j. On or about June 7, 2018, defendant **RACHEL SHEATS** emailed Pair and Harris regarding a complaint from a student's parent about an unauthorized drug test.

k. On or about August 1, 2018, Laboratory-1 and BPolloni Consulting entered into a second purported "marketing and sales agreement." Harris executed the agreement on behalf of BPolloni Consulting.

l.  In or about November 2018, ,the exact date being unknown, defendant **RACHEL SHEATS** received notice that Laboratory-1 was being audited by Georgia Medicaid CMO WellCare (the "WellCare Audit"). Many of the claims included in the WellCare Audit were for drug testing codes purportedly ordered by Dr. Duriel Gray.

m.  On or about November 19, 2018, defendant **RACHEL SHEATS** was advised by a third-party billing consultant that if the drug testing claims were determined by WellCare to be "routine," that the CMO would seek to recover the money.

n.  On or about November 28, 2018, Individual-2 emailed Pair and Harris regarding the WellCare audit.

o.  On or about November 28, 2018, defendant **RACHEL SHEATS** emailed Pair and Harris regarding the WellCare Audit and asked them to provide medical records which could be submitted to the CMO in an effort to justify the claims for which Laboratory-1 had been paid by Georgia Medicaid.

p.  In or about December 2018, Dr. Gray signed a letter addressed to WellCare that was drafted by Laboratory-1 and printed on Laboratory-1's letterhead falsely representing the medical necessity of the drug testing of the "patients," who were actually students participating in the D4H program. Defendant **RACHEL SHEATS** helped draft this letter. A senior-level employee of Laboratory-1 personally handed Dr. Gray the letter to sign.

q.  Dr. Gray signed the letter falsely claiming that all the individuals identified by the WellCare audit list were Dr. Gray's patients and for whom medical records existed, when in fact no such records existed.

r.  On or about December 18, 2018, Laboratory-1, through or at the direction of defendant **RACHEL SHEATS** submitted the false attestation of medical necessity to WellCare.

s.  On or about May 28, 2019, defendant **RACHEL SHEATS**, in an effort to conceal the fraudulent drug-screening tests, signed a letter that was sent on behalf of Laboratory-1 to WellCare falsely suggesting that the audit issue was simply a question of insufficient documentation for which Laboratory-1 should not be held responsible.

All in violation of Title 18, United States Code, Section 371.

**Forfeiture**

33. Upon conviction of the offense alleged in Count One of this Information, the defendant, **RACHEL SHEATS**, shall forfeit to the United States of America, pursuant to Title 18, United States Code, Code, Section 982(a)(7), any and all property, real or personal, constituting and derived, directly or indirectly, from proceeds traceable to the offense, including but not limited to the following:

    a. MONEY JUDGMENT: A sum of money in United States currency, representing the amount of proceeds obtained as a result of the offense of which the defendant is convicted.

34. If, as a result of any act or omission of the defendant, any property subject to forfeiture:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without undue complexity or difficulty,

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1) and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above.

RYAN K. BUCHANAN
*United States Attorney*


ALEX R. SISTLA
*Assistant United States Attorney*
Georgia Bar No. 845602

600 U.S. Courthouse
75 Ted Turner Drive SW
Atlanta, GA 30303
404-581-6000; Fax: 404-581-6181